**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | CR 08-1136-TUC-FRZ (JCG) |
| vs. ) | **REPORT &** |
| ) | **RECOMMENDATION** |
| 2) Defone Dajon Lewis, ) | |
| Defendant. ) | |

Pending before the Court is Defendant's Motion to Suppress filed on January 30, 2009. (Doc. No. 40.)  The United States filed a response on February 18, 2009.  (Doc. No. 50.)  The United States supplemented its response on March 17, 2009.  (Doc. No. 60.) Defendant did not file a reply.

Also pending before the Court is a Motion to Dismiss filed by Defendant on February 12, 2009.  (Doc. No. 47.)  The United States filed a response on March 12, 2009. (Doc. No. 57.)  Defendant filed a reply on March 16, 2009.  (Doc. No. 58.)

This matter was set for evidentiary hearing and evidence was heard on March 18, 2009.  Defendant Lewis, who has been released from custody, was present and represented by counsel.  This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motions.

**FACTUAL FINDINGS**

On August 11, 2008, at approximately 3:00 p.m., Border Patrol Agent Eric Martinez was positioned at the intersection of Papago Springs Road and State Route 83, just south of the Border Patrol's Sonoita Station.  According to Agent Martinez, the area in which he was stationed is approximately 30 miles from the United States/Mexico border.  Traffic through the area may be traveling to Nogales, Fort Huachuca, Parker Canyon Lake, or Interstate 10. Because it is ranching country, most people who reside in the area drive 4-wheel drive vehicles, such as trucks and SUVs. Agent Martinez testified that in his experience, the area is a common route for drug and alien smuggling.

On August 11, 2008, Agent Martinez observed a Chevrolet Caprice traveling northbound on SR83.  Agent Martinez thought the vehicle was an unusual type of vehicle to see driving in the area.  Based on his common experience with vehicles, Agent Martinez testified that the vehicle appeared to be riding "a bit low."  Agent Martinez also observed that the trunk of the vehicle was secured by a rope.  Agent Martinez believed that the rope-secured trunk could be a sign of alien smuggling; in his experience alien smugglers may hide an undocumented alien in the trunk of a vehicle and instruct the alien to hold the trunk partially-closed with a rope.  This strategy enables an undocumented alien to flee from the trunk quickly if the vehicle is stopped.  Agent Martinez also observed that the seven-digit license plate of the vehicle started with the letters "AB."  Agent Martinez testified that, in his experience, at that time, license plates starting with "A" signify that the vehicle is either newly-purchased or newly-registered.  Agent Martinez also testified that, in his experience, vehicles smuggling drugs or aliens are usually newly registered.  Agent Martinez called in the license plate; dispatch reported that the vehicle was registered to a "Charles Pralow" at a Fort Huachuca address.

Agent Martinez pulled behind the vehicle and followed it, but did not turn on his overhead lights or his siren.  The vehicle appeared to be navigating in a circle as though the occupants were not familiar with the area.  The vehicle was traveling below the legal speed

1    limit.  Based on these observations, Agent Martinez activated his lights and siren to initiate

2    a stop.  The vehicle sped up and began to flee.

3         Agent Martinez initially sped up to follow the vehicle, and gave the driver an

4    opportunity to pull over to the shoulder of the road in two different areas.  While Agent

5    Martinez followed the vehicle, he observed that the passenger of the vehicle repeatedly

6    looked behind him.  The driver of the vehicle continuously gestured with his left hand

7    outside the driver's side window.  Agent Martinez was driving at the maximum speed for the

8    road, yet the Chevy Caprice was driving faster and pulling away from him.  When Agent

9    Martinez reported to his supervisor that the vehicle was fleeing and traveling above the speed

10   limit, he was told to terminate pursuit and follow at a safe distance in case the occupants

11   abandoned the vehicle to flee on foot.  Near the intersection of State Route 90 and State

12   Route 82, Agent Martinez later saw the vehicle abandoned near a drainage ditch, surrounded

13   by Border Patrol vehicles.

14         Meanwhile, Border Patrol Agent Michael Carrasco was working on Border Patrol's

15   "Operation Short-Stop" in partnership with the Border Patrol's Naco station, when he

16   received a radio transmission regarding the Chevy Caprice's failure to yield.  When the

17   Chevy drove by Agent Carrasco's location, Agent Carrasco waited at least thirty seconds,

18   then followed approximately one mile behind it.  According to Agent Carrasco, the Chevy

19   was going "pretty fast."  He notified other agents of the vehicle's approach; those agents

20   employed a Controlled Tire Deflation Device ("spikes") to stop the vehicle.  Agent

21   Carrasco's vehicle was also stopped by the spikes and his vehicle came to a stop a few cars'

22   length behind the Chevy.  Agent Carrasco observed two men exit the vehicle and flee on

23   foot.  The passenger of the vehicle was a few inches taller than the driver and was wearing

24   jeans and a white-colored shirt.  The driver of the vehicle, identified by Agent Carrasco in

25   court as Defendant Lewis, was wearing khaki shorts and a white shirt.  Agent Carrasco saw

26   the driver run into a nearby trailer park.  Agent Carrasco exited his vehicle and ran to the

27   abandoned Chevy to stop it and prevent it from rolling into the road.  He then called dispatch

28   with a description of the driver and the passenger.

1    Border Patrol Agent Joshua Leavitt was on patrol east of the Sonoita Station when he

2    began receiving radio transmissions regarding the Chevy Caprice's failure to yield.  When

3    he heard that one occupant of the vehicle had been arrested but that a second was fleeing on

4    foot, he positioned his vehicle on the corner of State Route 90 and Oak Street to watch for

5    the subject to come out of a nearby mesquite field.  Agent Leavitt received a description of

6    the driver as a "black male in brown shorts."  He saw a man fitting that description run out

7    of the mesquite field.  Agent Leavitt exited his vehicle and pursued the driver on foot.  He

8    chased the suspect, who he identified in court as Defendant Lewis, across Highway 90,

9    caught up to him and grabbed him from behind.  Defendant voluntarily went to his knees.

10   Defendant became sick and Agent Leavitt drove him back to the abandoned Chevy, where

11   Border Patrol called an ambulance.  When Agent Leavitt brought Defendant back to the

12   Chevy, Agent Carrasco told Agent Leavitt Defendant was one of the occupants of  the

13   Chevy.  Agent Leavitt remained with Defendant during his medical treatment and until he

14   was returned to and detained at the Sonoita Station.

15   After his arrest on August 11, 2008, Defendant Lewis (and co-defendant Charles

16   Pralow) were charged with Conspiracy to Possess with Intent to Distribute Marijuana and

17   Possession with Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 846, 841(a) and

18   841(b)(1)(C).

19   On August 14, 2008, the Drug Enforcement Administration (DEA) Special Agent in

20   Charge (SAC) sent a letter to the United States Attorney indicating that the amount of seized

21   contraband drug exceeding the representative sample and the packaging would be destroyed

22   on or after the date listed in the notice unless a written request for an exception to the

23   destruction policy is received and approved by the office prior to the destruction date.  The

24   destruction date indicated in the notice was October 17, 2008.  (Doc. 57, Ex. 1.)

25   On August 23, 2008, the government filed a Notice of Intent to Destroy Contraband

26   with the Court ("the Notice"). (Doc. No. 8.)  A copy of the Notice was served on Defendant.

27   The Notice stated that contraband seized in this case would be destroyed sixty days from the

28   date of the Notice; the Notice specified that date as August 14, 2008.  The Notice further

provided that if Defendant wished to inspect the contraband prior to its destruction, Defendant should file a motion with the Court within 14 days of the date of the Notice. Sixty days from August 14, 2008, was October 13, 2008.

Although Defendant did not file a motion in response to the Notice, on October 16, 2008, counsel for defendant emailed a request to the assigned Assistant United States Attorney (AUSA), stating that Defendant wished to inspect and investigate the marijuana. After not receiving a response, defense counsel sent additional email requests on November 4, 2008 and November 7, 2008. On November 7, 2008, the AUSA responded, informing defense counsel that Defendant could inspect the marijuana and providing contact information for the case agent. On November 7, 2008, an investigator from the Office of the Federal Public Defender contacted the case agent to schedule inspection of the marijuana. The case agent informed the investigator that the marijuana was destroyed on October 31, 2008.

## ANALYSIS

**1.     Motion to Suppress**

Defendant contends that his Fourth Amendment rights were violated when (a) Agent Martinez stopped the vehicle without reasonable suspicion, (b) Agent Leavitt arrested Defendant without probable cause, and (c) agents searched the vehicle without probable cause.

**a.       The stop of the vehicle was lawful**.

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). A *Terry* stop occurs when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id*. at 19 n.16.

A stop is justified under the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe that the person stopped is, or is about to be, engaged in criminal activity. *See United States v. Arvizu,* 534 U.S. 266, 273 (2002). In making a

1    reasonable suspicion determination, the Court looks to the totality of the circumstances to
2    evaluate whether the detaining officer has a "particularized and objective basis" for
3    suspecting legal wrongdoing. *Id*. An officer's reasonable suspicion may be informed by the
4    officer's own experience and specialized training; an officer may make inferences from and
5    deductions about the cumulative information available to them that "might well elude an
6    untrained person." *Id*.

7         Any number of factors may be taken into account in deciding whether there is
8    reasonable suspicion to stop a car in the border area. *See United States v. Brignoni-Ponce*,
9    422 U.S. 873, 884-85 (1975).  Officers may consider the characteristics of the area in which
10   they encounter a vehicle: its proximity to the border, the usual patterns of traffic on the
11   particular road, and previous experience with border traffic are all relevant.  *Id*. (citations
12   omitted).  They also may consider information about recent illegal activity in the area.  *Id*.
13   at 885.  The driver's behavior may be relevant, as erratic driving or obvious attempts to evade
14   officers can support a reasonable suspicion. *Id*. (citations omitted).  Aspects of the vehicle
15   itself may justify suspicion.  *Id*.  The determination of whether agents have founded
16   suspicion to justify a stop may take into account all of the events that occur up to the time
17   of physical apprehension of a suspect who flees.  *See Santamaria-Hernandez*, 968 F.2d at
18   983.

19        In the present case, by the time agents stopped the vehicle drive by Defendant, agents
20   were relying on the following information. Defendant had been driving through an area
21   known for drug and alien smuggling.  Defendant's vehicle was not a typical vehicle for the
22   area.  The vehicle had newly issued license plates, which is common for vehicles used for
23   illegal activity.  Defendant's vehicle was riding somewhat low and the trunk was secured
24   with a rope, which in Agent Martinez's experience suggested that Defendant could be
25   transporting an undocumented alien in his trunk. When Agent Martinez followed Defendant,
26   Defendant drove at below the speed.  He made a turn and drove in a direction and took a
27   route suggesting he was not familiar with the area. When Agent Martinez activated his lights
28   and siren, the driver of the vehicle did not yield. During the time that Agent Martinez

followed the vehicle, the front seat passenger repeatedly glanced over his shoulder. Although the occupants of the vehicle were clearly aware that Agent Martinez was signaling for the vehicle to pull over, the vehicle failed to yield and increased its speed.

All of these circumstances, taken together, amount to a reasonable suspicion that Defendant was engaged in criminal conduct. *See Santamaria-Hernandez*, 968 F.2d at 984 (finding reasonable suspicion for the stop where agents observed conduct consistent with alien smuggling in an area known as a notorious smuggling area, defendant attempted to evade agents following his vehicle and failed to yield to agents); *United States v. Smith*, 217 F.3d 746, 750 (9th Cir. 2000) (evasive actions contribute to the totality of circumstances suggesting reasonable suspicion) .

### b.   Defendant's arrest was lawful

A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

A warrantless arrest must be supported by probable cause. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.1990). Probable cause exists if, "at the time the arrest is made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense' " *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir.2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also United States v. Carranza*, 289 F.3d 634, 640 (9th Cir.2002) ("Probable cause existed if under the totality of the circumstances known to the arresting officers, a prudent person would have

1    concluded that there was a fair probability that [the suspect] had committed a crime.")

2    (internal quotation marks and citations omitted).

3            Because Defendant was arrested within moments of the stop of the vehicle, the

4    circumstances leading up to the vehicle stop are to be considered in addition to the fact that

5    the Defendant jumped out of the moving car, abandoned the vehicle and fled from the agents.

6    The circumstances giving rise to a finding of reasonable suspicion for the stop of the vehicle,

7    plus Defendant's flight on foot support a finding of probable cause.  By the time Agent

8    Leavitt placed Defendant under arrest, agents knew that Defendant had driven a vehicle

9    bearing various characteristics associated with drug and/or alien smuggling through a known

10   drug and alien smuggling area, failed to yield the vehicle to officers to the extent that he was

11   violating posted speed limits to avoid law enforcement, and abandoned the vehicle and fled

12   on foot when his vehicle tires were spiked by agents.[1]  Based on these factors, a prudent

13   person would conclude that there was a fair probability that Defendant had committed a

14   crime.[2]  *See, e.g., United States v. Fuentes*, 105 F.3d 487 (9th Cir. 1997) (probable cause for

15   arrest existed where agents felt lump in Defendant's pocket,  Defendant seemed nervous, had

16   lied to the agents about his travel and earlier whereabouts, emphatically did not want officers

17   to feel and remove the lump and tried to forcibly get away); *and United States v.*

18   *Avalos-Ochoa*, 557 F.2d 1299 (9th Cir. 1977) (probable cause for arrest existed where agent

19   attempted to pull over defendant's vehicle but defendant failed to yield, defendant was

20

21   _____

22          [1]No evidence was introduced as to when agents found the contraband in the
     abandoned car in relation to Defendant's arrest.  Accordingly, the Magistrate Judge could not
23   and did not take the discovery of the contraband into account in reaching the
     recommendations in this report.
24

25          [2] The  agents also had probable cause to arrest Defendant based on their observation
     of his conduct.  If an officer has probable cause to believe that an individual has committed
26   even a minor criminal offense, he may, without violating the Fourth Amendment, arrest the
     offender.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  In the present case,
27   by the time Agent Leavitt arrested Defendant, the agents knew that Defendant had driven at
     speeds above the legal limit and failed to yield to federal law enforcement agents.
28

1  apprehended after police gave chase, defendant appeared to have crossed the border through

2  wet gullies, and Hispanic-appearing individuals were in defendant's vehicle).

3       Defendant contends that the Court cannot consider Defendant's jumping from the

4  vehicle, and his subsequent flight from agents at the scene and from Agent Leavitt in

5  determining whether there was probable cause to arrest Defendant.  According to the

6  Defendant, he was stopped – for purposes of analyzing probable cause – when the vehicle

7  he was driving was brought to a halt by the tire deflation devices.  Because at the time the

8  vehicle was stopped, agents could have determined that there were no aliens in the vehicle,

9  Defendant contends there was no probable cause for his arrest.  He cites *Brower v. County*

10  *of Inyo*, 489 U.S. 593, 598 (1989) in support.

11       *Brower* is factually distinguishable.  In that case, the suspect and the suspect's vehicle

12  were stopped simultaneously when the suspect drove his vehicle into a barrier set up across

13  the highway by police and was killed.  *Id.* at 594, 598.  Here, although the vehicle Defendant

14  was driving was stopped by the tire deflation devices, Defendant was not.  He jumped out

15  of the vehicle and continued to run - for quite a distance.  Where a suspect is not seized prior

16  to his flight, the suspect is not "seized" until the officer physically apprehends the suspect.

17  *See California v. Hodari D.*, 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (no

18  seizure occurs if suspect does not yield in response to a show of authority; seizure only

19  occurs when either the suspect is physically subdued or submits to the assertion of authority);

20  *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir.1992) ("We conclude,

21  then, that Santamaria was not 'seized' for Fourth Amendment purposes until he was

22  physically apprehended by the border patrol agents at the end of the chase").

23       **c.     Unlawful search**

24       Defendant does not have standing to challenge the search of the Caprice because he

25  did not have a reasonable expectation of privacy in the vehicle.  The court must consider

26  whether, through words, acts or other objective indications, a person has relinquished a

27  reasonable expectation of privacy in the property at the time of the search or seizure.  *United*

28  *States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).  The determination is made in light

1   of the totality of the circumstances, and two important factors are denial of ownership and

2   physical relinquishment of the property. *Id.* Defendant bears the burden of establishing his

3   reasonable expectation of privacy in the property seized. *See Rakas v. Illinois. 439 U.S. 128,*

4   *130 nt. 1 (1978)*;*United States v. Fernandez*, 772 F.2d 495, 499 (9th Cir. 1985).

5        The government invited the Defendant to introduce evidence in support of his claim

6   of standing.  The Defendant declined, and has failed to meet his burden of proof as to

7   standing.  The evidence before the Court demonstrates that Defendant's actions were not

8   consistent with any reasonable expectation of privacy.  The vehicle was registered to co-

9   defendant Charles Pralow; Defendant was not the owner of the vehicle and there is no

10  evidence that the owner of the vehicle had authorized Defendant's possession. *See United*

11  *States v. Vizcarra*, 835 F.Supp. 1160 (D. Ariz. 1993) (citing *United States v.  Arango*, 912

12  F.2d 441, 445 (10th Cir.1990)).  Defendant fled the vehicle on foot, leaving the vehicle

13  behind, in gear, after agents used spikes to stop the vehicle.  Where a defendant does not own

14  the vehicle involved, is not present during the search of the vehicle and manifests his

15  intention to abandon the vehicle, he has failed to demonstrate a legitimate expectation of

16  privacy required to challenge the instant searches and seizures. *See United States v. Culbert*,

17  595 F.2d 481, 482 (9th Cir. 1979); *see also Nordling*, 804 F.2d at 1470 (where defendant

18  deliberately chose to leave bag behind when requested by officers to leave the plane, court

19  could well find that his action were inconsistent with a continued expectation of privacy in

20  the property).[3]

21

22

23

---

24       [3]Defendant objected to the Court's conclusion that he did not have a reasonable

25  expectation of privacy in the vehicle.  The Court asked the Defendant for a proffer on this
    issue.  According to Defendant, the two significant points on this issue are: (1) the vehicle

26  was forcibly stopped by the tire deflation devices and therefore, not voluntarily abandoned
    by the Defendant, and (2) the Defendant was the driver of the vehicle. Tr. 14-15 Neither of

27  these two facts, alone or taken together, is sufficient to demonstrate Defendant's expectation

28  of privacy.

1

2    **2.      Motion to Dismiss**

3         In order for destruction or loss of evidence to constitute a constitutional violation,

4    "[the] evidence must both possess an exculpatory value that was apparent before the evidence

5    was destroyed, and be of such a nature that the defendant would be unable to obtain

6    comparable evidence by other reasonably available means." *California v. Trombetta*, 467

7    U.S. 479, 489 (1984).  Where lost or destroyed evidence is deemed to be only potentially

8    exculpatory, as opposed to apparently exculpatory, the defendant must show that the

9    evidence was destroyed in bad faith. *See In Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

10        In the present case, Defendant has failed to make a showing of bad faith on the part

11   of the government.  The evidence demonstrates that the government followed its standard

12   procedure in maintaining and destroying the marijuana.  Defendant made one attempt to

13   notify the government that he wished to inspect the marijuana before it was destroyed; that

14   attempt was not a motion as required by the government's Notice and it was not made within

15   14 days of the date of the  Notice.  Counsel for the government stated at the hearing that his

16   failure to respond to Defendant's email request to inspect the marijuana was an oversight.

17   The agent responsible for destruction of the marijuana had not received any communication

18   from the government or defense counsel indicating that defense counsel wished to inspect

19   the marijuana prior to its destruction.  In sum, there is no evidence suggesting that the

20   government destroyed the marijuana despite knowing that Defendant wished to inspect it,

21   or otherwise acted in bad faith.

22                          **RECOMMENDATION**

23        In view of the foregoing, it is recommended that, after its independent review of the

24   record, the District Court DENY Defendant's Motion to Suppress filed on January 30, 2009.

25   (Doc. No. 40.)

26        The Magistrate Judge further recommends that after its independent review of the

27   record, the District Court DENY Defendant's Motion to Dismiss filed on February 18, 2009.

28   (Doc. No. 50.)

1       The parties have **ten (10) days** to serve and file written objections to the Report and

2   Recommendation.   The parties are advised that any objections should be filed with the

3   following caption: **CR 08-1136-TUC-FRZ.**

4       DATED this 29th day of April, 2009.

_____
Jennifer C. Guerin
United States Magistrate Judge

- 12 -